No. 98,487

ROGER ZIMMERMAN, *et al., Appellants/Cross-appellees,* and A.B. HUDSON AND LARRY FRENCH, *Intervenors/Appellants/Cross-appellees,* v. BOARD OF COUNTY COMMISSIONERS OF WABAUNSEE COUNTY, KANSAS, *Appellees/Cross-appellants.*

(218 P.3d 400)

928

Opinion filed October 30, 2009.

*Jack Scott McInteer,* of Depew Gillen Rathburn and McInteer, L.C., of Wichita, argued the cause and was on the brief for appellants/cross-appellees Roger Zimmerman, *et al.*

*Scott A. Grosskreutz,* of Cavanaugh and Lemon, P.A., of Topeka, argued the cause and *Bryan W. Smith* of Cavanaugh, Smith, and Lemon, P.A., of Topeka, was with him on the briefs for the intervenors/appellants/cross-appellees A.B. Hudson and Larry French.

*William L. Frost,* of Morrison, Frost, Olsen and Irvine, LLP, of Manhattan, argued the cause, and *Katharine J. Jackson,* of the same firm, was with him on the brief for appellee/cross-appellant Board of Wabaunsee County Commissioners.

*Richard H. Seaton,* of Seaton, Seaton and Gillespie, L.L.P., of Manhattan, was on the brief for *amici curiae* Audubon of Kansas and Kansas Wildlife Federation.

*Michael D. Irvin,* of Kansas Farm Bureau, of Manhattan, was on the brief for *amicus curiae* Kansas Farm Bureau.

The opinion of the court was delivered by

NUSS, J.: This appeal results from the decision by the Board of County Commissioners of Wabaunsee County (Board) to amend its zoning regulations. Specifically, the Board prohibited the placement of Commercial Wind Energy Conversion Systems (CWECS, *i.e.,* commercial wind farms) in the county. Plaintiffs and plaintiff intervenors (Intervenors) are owners of land and of wind rights, respectively, in the county.

The district court granted the Board's various motions to dismiss. Plaintiffs and Intervenors appeal, and the Board cross-appeals. Our jurisdiction is pursuant to K.S.A. 20-3017 (transfer from Court of Appeals on our motion).

The parties' issues on appeal, and our accompanying holdings, are as follows:

PLAINTIFFS' AND INTERVENORS' SHARED ISSUES:

1. Did the district court err in determining that the Board's decision amending the zoning regulations was lawful, *i.e.,* that it did not violate the procedures outlined in K.S.A. 12-757? No.

2. Did the district court err in determining that the Board's decision amending the zoning regulations was reasonable? No.

3. Did the district court err in precluding Plaintiffs and Intervenors from conducting discovery or submitting evidence on the reasonableness of the zoning regulation amendments? No.

4. Did the district court err in dismissing the claim alleging that the decision amending the zoning regulations violated the Contract Clause of the United States Constitution? No.

INTERVENORS' ISSUES:

5. Did the district court err in dismissing Intervenors' claim alleging preemption of the zoning regulation amendments by state law? No.

6. Did the district court err in dismissing Intervenors' claim alleging preemption of the zoning regulation amendments by federal law? No.

BOARD'S ISSUE ON CROSS-APPEAL:

7. Was the Intervenors' action under K.S.A. 12-760(a) commenced in a timely manner? Yes.

Concurrent with the release of this opinion, this court has ordered the parties to submit supplemental briefs on certain questions raised in the issues originally presented on appeal by both Plaintiffs and Intervenors. Those original issues are: whether the district court erred in dismissing the claims alleging that the Board's decision amending the zoning regulations violated the Takings Clause and the Commerce Clause of the United States Constitution.

Our order requiring supplemental briefing on takings necessarily stays our resolution of the following issues originally presented on appeal by Intervenors: whether the district court erred in dismissing their claims under 42 U.S.C. § 1983 (2006) and inverse condemnation.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are owners of land in Wabaunsee County who have entered into written contracts for the development of commercial

wind farms on their properties. Intervenors are the owners of wind rights concerning other properties in the county.

Defendant is the three-member Board of County Commissioners of Wabaunsee County. The county is roughly 30 miles long and 30 miles wide, containing approximately 800 square miles and 7,000 people. It is located in the Flint Hills of Kansas, which contain the vast majority of the remaining Tallgrass Prairie that once covered much of the central United States.

In October 2002, the county zoning administrator told the Board that he had been contacted by a company desiring to build a wind farm in the county. At that time, the county had no zoning regulations relating specifically to wind farms. The next month, the Board passed a temporary moratorium on the acceptance of applications for conditional use permits for wind farm projects until the zoning regulations could be reviewed. The moratorium was extended on at least five occasions.

The following month, December 2002, the county planning commission conducted its first public meeting to discuss amending zoning regulations regarding commercial wind farms.

On July 24, 2003, the planning commission held a public hearing for discussion of the proposed zoning regulations which included regulations of small and commercial wind farms. A month later, the Board ordered the planning commission to review and recommend updates to the 1974 Wabaunsee County Comprehensive Plan (Plan) because it did not address changes that had occurred in the county in intervening years. After the Plan had been reviewed, the Board intended to consider the new proposed regulations regarding wind turbines.

On February 15, 2004, after input from the public, including a county-wide survey and focus groups, the planning commission formally recommended the adoption of the revised Comprehensive Plan 2004.

On April 26, 2004, the Board adopted the planning commission's recommended changes to the Plan and adopted the Comprehensive Plan 2004. It included the goals and objectives previously recommended to the Board. The Comprehensive Plan 2004 provides in relevant part that the county would endeavor to:

A. Establish an organized pattern of land use with controlled and smart growth that brings prosperity to the county while also respecting its rural character.

B. Maintain the rural character of the county with respect to its landscape, open spaces, scenery, peace, tranquility, and solitude.

C. Develop moderate and slight growth of businesses, industries, and services with small-scale employment.

D. Develop realistic plans to protect natural resources such as the agricultural land, landscape, scenic views, and Flint Hills through regulatory policies.

E. Promote historic preservation, which protects and restores historic properties, old limestone buildings, and landmarks in the county.

F. Attract small retail businesses and encourage clustering of retail and service businesses.

G. Improve school system and other public utilities to address the existing deficiencies and needs.

H. Develop tourism programs involving historic properties, nature of rural character, and scenic landscape.

I. Provide affordable and good quality housing with respect to current deficiencies and future needs.

J. Attract new population, a stronger labor force, and retain youth.

On May 20, after the Board's adoption of the Comprehensive Plan 2004, the planning commission held a public hearing to discuss proposed amendments to the zoning regulations regarding small and commercial wind farms. At its next meeting, the commission voted 8-2 to recommend that the Board approve the proposed zoning amendments which would allow CWECS (commercial wind farms) as a conditional use, subject to certain conditions.

The following month, on June 28, the Board voted 2-1 to adopt in part and override in part the planning commission's recommended zoning changes. Specifically, the Board adopted the commission's recommendations regarding regulation of Small Wind Energy Conversion Systems (SWECS, *i.e.*, small wind farms). It rejected, however, the commission's recommendations regarding

regulation of CWECS and prohibited commercial wind farms in the county.

The Board's decision was formally reflected in Resolution No. 04-18, passed 2 weeks later on July 12, 2004. The Resolution articulated the following basis for the Board's decision:

"The basis of the amendments to the Zoning Regulation is that Commercial Wind Energy Conversion Systems would not be in the best interests of the general welfare of the County as a whole. They do not conform to the intent and purpose of the Zoning Regulations. In light of the historical, existing and anticipated land uses in the County, they would adversely affect the County as a whole. They would be incompatible with the rural, agricultural, and scenic character of the County. They would not conform to the Wabaunsee County Comprehensive Plan, including the goals and objectives that were identified by the citizens of the County and incorporated as part of the Plan. They would be detrimental to property values and opportunities for agricultural and nature based tourism. Each reason stands on its own. This motion is based upon what has been presented at public hearings, public meetings, letters and documents that have been produced, as well as experience and personal knowledge of the issues involved."

The Resolution also added the following definitions to Article 1-104 of the zoning regulations passed in 1995:

"207. Wind Energy Conversion System (WECS). The combination of mechanical and structural elements used to produce electricity by converting the kinetic energy of wind to electrical energy. Wind Energy Conversion systems consist of the turbine apparatus and any buildings, roads, interconnect facilities, measurement devices, transmission lines, support structures and other related improvements necessary for the generation of electric power from wind.

"208. Commercial Wind Energy Conversion System: A Wind Energy Conversion System exceeding 100 kilowatt or exceeding 120 feet in height above grade, or more than one Wind Energy Conversion System of any size proposed and/or constructed by the same person or group of persons on the same or adjoining parcels or as a unified or single generating system. (*Commercial Wind Energy Conversion Systems are specifically prohibited as a use in Wabaunsee County.*) (Emphasis added.)

. . . .

"210. Small Wind Energy Conversion System. A wind energy conversion system consisting of wind turbine, a tower, and associated control or conversion electronics, which has a rated capacity of not more than 100 kilowatt, which is less than 120 feet in height and which is intended solely to reduce on-site consumption of purchased utility power."

A new paragraph (30) was added to Article 31-105 reiterating that commercial systems were prohibited in Wabaunsee County:

"30. Commercial Wind Energy Conversion Systems are not a use that may be approved or permitted as a Conditional Use in Wabaunsee County and are specifically prohibited."

Article 31-109 was amended to include parameters for SWECS. These restrictions include a minimum parcel size (no system shall be located on a parcel of less than 20 contiguous acres); density (no more than one system shall be located on each 20 acres of parcel); spacing (no system may be located within 300 feet of another system or a commercial wind energy conversion system); setback (a setback from the nearest property line a distance equal to twice the height of the system, including the rotor blades and a setback from the nearest public road right-of-way a distance equal to the height of the system, including the rotor blades, plus an additional 50 feet); blade height (the lowest point of the rotor blades shall be at least 50 feet above ground level at the base of the tower); and advertising restrictions (no advertising of any kind shall be located on the system).

Article 31-112 (Prohibited Uses) was amended to include a new paragraph (5):

"5. *No Commercial Wind Energy Conversion System, as defined in these Regulations, shall be placed in Wabaunsee County.* No application for such a use shall be considered." (Emphasis added.)

Plaintiffs sued the Board in district court, seeking a judicial declaration that the Board's action in passing Resolution No. 04-18 be null and void. Plaintiffs also sought damages under a number of different theories.

Without filing an answer, the Board filed a motion to dismiss for failure to state a claim and for lack of jurisdiction. In decisions dated February 23 and July 22, 2005, the district court, Judge Klinginsmith, held the Board followed the proper procedures under K.S.A. 12-757(d) in adopting Resolution 04-18 and dismissed Count II. It also dismissed four more of Plaintiffs' claims. These were Count I: state preemption; Count IV: violation of the Contract Clause of the United States Constitution; Count V: violation

of the Commerce Clause of the United States Constitution; and Count VI: federal preemption. It reserved judgment on the remaining Count III (unconstitutional taking) and Count VII (42 U.S.C. § 1983 [2000]) holding that their consideration was premature until the court could determine the reasonableness under K.S.A. 12-760 of the Board's adoption of Resolution No. 04-18.

The court then ordered the Board to prepare, and file by October 3, 2005, the record of its proceedings "whereby it considered, and eventually adopted, resolution 04-18."

On August 7, 2005, after court approval, Intervenors filed their petition. Their claims duplicated all of those brought by Plaintiffs, but Intervenors also brought a claim for inverse condemnation. Despite this new petition, the district court refused to reconsider its earlier rulings dismissing those Plaintiffs' claims now also brought by Intervenors.

On November 15, 2005, the Board submitted the records from the planning commission to the district court. The following month it filed an amended record.

Plaintiffs then requested to depose each of the three Board members. The Board objected, arguing that its members were performing a legislative function and their thought processes should not be examined. The district court eventually denied the deposition requests on March 2, 2006, apparently based upon its holding that the Board's action was legislative.

Plaintiffs also sought to supplement the record with notices of public hearings and court reporter transcripts from several planning commission meetings. This request was later granted on March 2.

Also on March 2, 2006, the district court rejected the record submitted by the Board several months earlier. Although it found the Board's action was legislative, it also found that the Board's given basis for adopting the resolution was "wholly conclusory." In other words, the record did not contain findings of fact upon which the court could determine the reasonableness of the Board's decision. Judge Klinginsmith remanded the matter to the Board with orders to make findings of fact and conclusions supported by those findings. In response, the Board ordered the county's zoning ad-

ministrator to review the record of the proceedings regarding the adoption of the Resolution, gather information from those involved in the hearings before the Board and planning commission, and prepare a report which would set forth the facts the zoning administrator determined to be relevant to the Resolution.

The zoning administrator filed a report, which the Board formally adopted at its September 18, 2006 meeting. On October 6, the Board submitted these 13 findings of fact and 6 conclusions to the court.

On October 12, Judge Ireland, as successor to the now-retired Judge Klinginsmith, issued a Memorandum Decision again remanding the matter to the Board. Judge Ireland acknowledged the Board's findings of fact and conclusions but found that the Board had not fully complied with Judge Klinginsmith's March 2 order because the submitted facts were conclusory and did not consider the factors in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978). He noted that the Board had the responsibility to produce evidence that it had acted reasonably.

The Board then asked Judge Ireland to reconsider his October 12 decision. In its motion, it pointed out that it had submitted 391 pages of transcript and findings in response to the court's multiple orders. The Board argued that while the court had determined that the Resolution was a legislative zoning decision, it had "required the County to produce a level of evidence, supporting its decision, which is inapplicable to the standard of review of legislative zoning decisions." While still maintaining its position that it had sufficiently complied, on November 16, 2006, the Board supplemented the record with additional findings of fact.

The additional findings are simply a list of each of the 11 reasons specified in the Resolution. Each reason then is accompanied by a representative sampling of evidence in the record in alleged support, complete with citations to the records which are attached as exhibits. The Board's 11 listed reasons are: general welfare; zoning regulations; quality of life; history and culture; environment, wildlife, tallgrass ecosystem; surface and subsurface water; infrastructure, roads and bridges; aesthetics; Comprehensive Plan 2004; property values in the county; and tourism.

Plaintiffs then sought to strike the Board's findings of fact because they were based upon a report prepared by the zoning administrator, who had not been hired until after the Resolution had passed.

The court later held a hearing where the parties discussed the various motions and the applicability of the *Golden* factors to the Board's decision. Judge Ireland agreed with the Board, and Judge Klinginsmith, that the passage of the Resolution was a legislative action. In a Memorandum Decision on February 28, 2007, the judge ruled that the Plaintiffs' motion was moot given the court's acknowledgment of its own error in reciting an incorrect legal standard (presumably the applicability of *Golden* given the court's determination that the passage of the Resolution was a legislative action). Judge Ireland also held that the Board's motion to reconsider was moot because the Board had already "filed the necessary clarifications requested by the Court." He concluded that "[i]t appears the county has complied with Judge Klinginsmith's remand to identify each fact they relied upon in making their decision regarding zoning."

Judge Ireland then dismissed Plaintiffs' and Intervenors' three remaining claims based upon unreasonableness, taking, and 42 U.S.C. § 1983 (2006), as well as the Intervenors' claim of inverse condemnation. He first determined that the Board's action was reasonable and that there was "substantial evidence which a reasonable mind might accept as adequate to support the conclusions reached by the County." He ruled that the "County has taken into account the benefit or harm involved to the community at large and has exercised a decision on that basis which is not so·wide of the mark that its unreasonableness is outside the realm of fair debate."

Judge Ireland next concluded that "[o]nce the district court determines the zoning action was reasonable there is no taking." He determined that the Board did not take away any existing rights; it just "refused to expand the existing rights including wind rights."

As for the taking claims under 42 U.S.C. § 1983, Judge Ireland applied a similar rationale. He held that because there was no dep-

rivation of an existing federal right, *i.e.*, no taking under the Fifth Amendment to the United States Constitution, the claim failed.

As for the claim of inverse condemnation, Judge Ireland held that it too depended upon an unreasonable exercise of the police power. Because he had held that the Board's amendment of the zoning regulations was reasonable, this claim too failed.

## ANALYSIS

The parties present numerous issues in their briefs. However, the Plaintiffs and the Intervenors candidly conceded at oral arguments that their strongest claims were that the Board's Resolution to amend the county's zoning regulations was (1) unlawful and (2) unreasonable. The number of pages in the briefs of all three parties devoted to these two claims further supports the view that these two issues are primary. We agree with the parties' assessment. Consequently, the largest portion of our analysis addresses them.

THE PLAINTIFFS' AND THE INTERVENORS' SHARED IS-SUES

Issue 1: *The district court did not err in determining that the Board's zoning decision was lawful.*

Plaintiffs and Intervenors argue that because the Board failed to follow the procedural requirements of K.S.A. 12-757(d), Judge Klinginsmith erred in holding as a matter of law that the Board acted lawfully and therefore erred in dismissing their claim. Specifically, they contend that the Board unlawfully amended the zoning regulations to prohibit commercial wind farms without first resubmitting it to the planning commission which had recommended approval and regulation of all wind farms. The Board responds that K.S.A. 12-757(d) allows a board to modify a regulation submitted by the planning commission without returning the proposal if it has a two-thirds super-majority. Determining the lawfulness of the Board's action is within the scope of review of the district court. *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980).

We note that " ' "[d]ismissal is justified only when the allegations of the petition clearly demonstrate plaintiff does not have a

claim." ' " *Blevins v. Board of Douglas County Comm'rs*, 251 Kan. 374, 381, 834 P.2d 1344 (1992).

K.S.A. 12-757(d) outlines the procedure to be followed when amending a zoning regulation. A planning commission must first recommend approval or denial of a rezoning request. The statute then requires:

> "When the planning commission submits a recommendation or approval or disapproval of such amendment and the reasons therefore, the governing body may: (1) *Adopt* such recommendation by . . . resolution in a county; (2) *override* the planning commission's recommendation by a ⅔ *majority* vote of the membership of the governing body; or (3) *return* such recommendation to the planning commission with a statement specifying the basis for the governing body's failure to approve or disapprove. If the governing body returns the planning commission's recommendation, the planning commission, after considering the same, may resubmit its original recommendation giving the reasons therefor or submit new and amended recommendation. Upon the receipt of such recommendation, the governing body, by a *simple majority* thereof, *may adopt or may revise or amend and adopt* such recommendation by the respective . . . resolution, or it need take no further action thereon." (Emphasis added.)

This court has held that " 'the power of a city government to change the zoning of property . . . can only be exercised in conformity with the statute which authorizes the zoning.' [Citation omitted.] As a result, a city's failure to follow the zoning procedures in state law renders its action invalid." *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1033, 181 P.3d 549 (2008). The same requirements apply to counties when they adopt or modify zoning regulations.

Several additional standards of review apply here. First, "[i]nterpretation of a statute is a question of law, . . . and our review is unlimited. Accordingly, when determining a question of law, we are not bound" by the trial court's interpretation of a statute. *Schmidtlien Electric, Inc. v. Greathouse*, 278 Kan. 810, 819, 104 P.3d 378 (2005). "When construing a statute, a court should give words in common usage their natural and ordinary meaning." 278 Kan. at 822.

Second, "[t]he fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained." *Steffes v. City of Lawrence*, 284 Kan. 380, Syl.

¶ 2, 160 P.3d 843 (2007). "When language is plain and unambiguous, there is no need to resort to statutory construction. An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there." 284 Kan. 380, Syl. ¶ 2.

Plaintiffs and Intervenors argue that K.S.A. 12-757(d) only allows the Board to revise or amend the recommendation after it has been returned to the planning commission and resubmitted to the Board. According to them, without remand the Board can only adopt or reject the Resolution in whole. They point to the definition of the statute's "override," which is "to set aside," "annul," or "veto." Plaintiffs contend that these words imply complete rejection. Intervenors argue that if the legislature intended to authorize the Board to revise or amend, it would have used the words "revise or amend" rather than "override."

Plaintiffs and Intervenors also point to the previous version of the statute, K.S.A. 12-708 (Ensley 1982), which gave the Board only two options—adopt the recommendation or return it to the planning commission. In support, they cite *City of Manhattan v. Ridgeview Building Co., Inc.*, 215 Kan. 606, 527 P.2d 1009 (1974), a case decided under the old statute. In *Ridgeview*, the court held that the city, as governing body, could not amend the recommendation: it had to either adopt it in full or return it to the planning commission. 215 Kan. at 610.

The Board responds that the whole purpose of the super-majority two-thirds requirement is to authorize the Board to take some action other than that recommended by the planning commission. The Board also argues that the legislature's intention in replacing K.S.A. 12-708 with 12-757 was to expand the options available to the Board.

This issue is resolved by the guidance provided in *Manly v. City of Shawnee*, 287 Kan. 63, 194 P.3d 1 (2008). There, the Manlys objected to the school district's request for a special use permit for a proposed lighted softball facility near their home. The planning commission for the City of Shawnee recommended denial of the permit, and the city council later remanded to the planning commission for further review to consider certain additional items. On

remand, the planning commission again recommended denial. The city council then reconsidered the request for the permit. On a 5-4 vote, the council passed a motion "to grant the special use permit in contravention of the planning commission recommendation and to modify any conflicting portion of the City's comprehensive plan." 287 Kan. at 66.

After the Manlys filed a petition in district court pursuant to K.S.A. 12-760(a), the judge found that the City's action in "overriding the planning commission's renewed recommendation with a simple majority was unlawful" because it contravened K.S.A. 12-757(d). 287 Kan. at 66. More specifically, the judge found that a super-majority vote of two-thirds was required under the statute, just as would have been required had the city overridden the commission's initial recommendation before remand. 287 Kan. at 69.

This court reversed the district court on a number of bases, several of which are of particular assistance in analyzing the instant case.

The *Manly* court first looked at the three options available to the governing body under K.S.A. 12-757(d) after its initial receipt of the planning commission's recommendation regarding a proposed zoning amendment. Those "clearly establishe[d]" options, 287 Kan. at 68, and the *Manly* court's choice of the following language in describing them, particularly Option 2, are of importance.

Option 1: "Adopt such recommendation by ordinance in a city or by resolution in a county." 12-757(d). As the *Manly* court described this option, the governing body can "take the recommended action by a simple majority vote." 287 Kan. at 68.

Option 2: "[O]verride the planning commission's recommendation by a ⅔ majority vote of the membership of the governing body." 12-757(d). As the *Manly* court described this option, the governing body can "take action *contrary to* the recommendation by a two-thirds majority vote." (Emphasis added.) 287 Kan. at 68.

Option 3: "[R]eturn such recommendation to the planning commission with a statement specifying the basis for the governing body's failure to approve or disapprove . . . . Upon the receipt of such recommendation [from the planning commission], the governing body, by a simple majority thereof, may adopt or may revise or amend and adopt such recommendation by the respective ordinance or resolution, or it need take no further action thereon." 12-757(d).

As the *Manly* court described this third option, the governing body can "return the proposal to the planning commission with a statement specifying the basis for the City's failure to follow the recommendation, *i.e.*, remand the proposal to the planning commission for reconsideration." 287 Kan. at 68-69.

The *Manly* court examined the language of the statute to reverse the district court's ruling regarding Option 3:

"As noted, 12-757(d) plainly gives the City the authority to 'revise or amend and adopt' a planning commission [renewed/resubmitted] recommendation by a simple majority vote. To circumvent that plain language, the Manlys attempt to convince us that the City's authority to '*revise or amend*' a recommendation *does not include the right to reject or overrule the recommendation.* However, that contention defies logic. *Obviously, when the City revises or amends a recommendation before taking action, it has implicitly rejected or overruled that part of the recommended action which was not followed. Moreover, where the recommendation is to completely deny a special use permit, i.e., to tell the applicant 'no,' it is difficult to imagine how one revises or amends that recommendation without overriding it to some extent, i.e., the only way to revise or amend 'no' is to say 'yes' to something.*" (Emphasis added.) 287 Kan. at 71.

Although the court was addressing Option 3, it used similar language in identifying Option 2, the one at issue here: the statutory "override the recommendation" was interpreted as any "action contrary to the recommendation." 287 Kan. at 68. Accordingly, *Manly*'s equation of "reject," "overrule," and "override to some extent" with "revise or amend" indicates that in the instant case the Board was within its statutory power to "override" when it "revised and amended" the recommendation of the planning commission. See 287 Kan. at 71.

The *Manly* court also reviewed the history of the planning commission statutes. Like some of the parties in the instant case, it observed that prior to the passage of K.S.A. 12-757(d) in 1991, "the City would have had no option upon initially receiving a planning commission recommendation with which it did not agree. It had to return the proposal to the planning commission." 287 Kan. at 72. The former statute, K.S.A. 12-708 (Weeks 1975), generally provided what we have referred to as Options 1 and 3: "The governing body may either [1] *approve* such recommendations by the adoption of the same by ordinance or [2] *return* the same to the

planning commission for further consideration, together with a statement specifying the basis for disapproval.]" (Emphasis added.) The *Manly* court further noted that under the former statute, "[t]he procedures upon remand to the planning commission and upon its return to the City were the same as in the current statute." 287 Kan. at 72.

After this historical review, the *Manly* court concluded that the addition of the third option—our Option 2—supported its holding. 287 Kan. at 72-73. In articulating this point, the court again allowed that the statutory "override" of the planning commission's recommendation could include more than just total rejection or complete overruling. Override could include any contrary action, *i.e.*, varying degrees of "contravention," if the governing body felt that obtaining further planning commission input was pointless:

"In [adding] K.S.A. 12-757(d), the legislature gave the City another option upon receiving an initial recommendation with which it did not agree. Rather than remanding to the planning commission for reconsideration, a City could move forward with *taking action in contravention of the recommendation if two-thirds of the governing body did not feel the need for further input from its advisory commission. That option eliminates the need for a pointless remand.*" (Emphasis added.) 287 Kan. at 72-73.

Accordingly, *Manly*'s continued acknowledgment that "override" can be something less than total rejection certainly indicates that here the Board was within its statutory power to override when it modified, *i.e.*, took action in some degree of contravention to the recommendation of the planning commission.

In its analysis, the *Manly* court also considered the doctrine of separation of powers. It reiterated that a planning commission is created to fulfill an advisory function while " 'the final authority in zoning matters rests with the governing body possessing legislative power.' " 287 Kan. at 71. Accordingly, "[i]f the legislature intended to allocate the ultimate authority to grant or deny a zoning amendment to the planning commission, it would be impermissibly shifting the City's governance from the elected City Council to an appointed advisory commission." 287 Kan. at 70-71. It observed that requiring a two-thirds vote on the commission's resubmitted recommendation to the City Council impermissibly "would permit a

simple majority of the planning commission to govern over a simple majority of the City Council." 287 Kan. at 71.

In short, *Manly's* guidance indicates that a governing body with a super-majority is not required to return a recommendation to the planning commission for review. As a result, the district court correctly ruled that the Board complied with the procedural requirements of K.S.A. 12-757(d) when it modified the commission's initial recommendation by a 2-1 vote.

Issue 2: *The district court did not err in determining that the Board's decision was reasonable.*

Plaintiffs and Intervenors next argue that Judge Ireland erred in holding as a matter of law that the Board's Resolution banning all commercial wind farms was reasonable and therefore erred in dismissing this claim. They correctly point out that because he disposed of their claim after considering matters outside of the pleadings, the disposition is characterized as a summary judgment. See K.S.A. 60-212(b)(6) (if matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in K.S.A. 60-256).

The Board responds it acted reasonably. Determining the reasonableness of its action is also within the scope of review of the district court. See K.S.A. 12-760(a) (any person aggrieved "may maintain an action in the district court to determine the reasonableness of such final decision."); *Combined Investment Co.*, 227 Kan. at 28.

We first observe that this court "concisely stated" the rules governing the scope of judicial review of zoning matters in *Combined Investment Co.*, 227 Kan. at 28, particularly on the issue of reasonableness:

"(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.
"(2) The district court's power is limited to determining
 (a) the lawfulness of the action taken, and
 (b) the reasonableness of such action.
"(3) There is a presumption that the zoning authority acted reasonably.

"(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

"(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

"(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

"(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

"(8) An appellate court must make the same review of the zoning authority's action as did the district court."

See *Golden v. City of Overland Park*, 224 Kan. 591, 595-96, 584 P.2d 130 (1978).

As a threshold question, however, the Intervenors and the Board argue whether the Board's regulation-amending action was legislative or quasi-judicial. Judge Klinginsmith ruled that the Board was acting in a legislative capacity because the zoning decision "was an amendment to the existing zoning ordinances of the county, resulting in county wide exclusion of [CWECS] rather than to a specific tract of land." Judge Ireland eventually agreed. As noted, the county is approximately 30 miles long and 30 miles wide.

Intervenors argue the court erred in its holding because the Board's decision was quasi-judicial, committed "under the guise of a county wide ban" but actually "seeking to prohibit the CWECS on specific tracts of land." They cite *McPherson Landfill, Inc. v. Shawnee County Comm'rs*, 274 Kan. 303, 305, 49 P.3d 522 (2002); see also *Golden*, 224 Kan. at 597 ("When . . . the focus shifts from the entire city to one specific tract of land for which a zoning change is urged, the function becomes more quasi-judicial than legislative."). Intervenors conclude that, as a result, "the eight factors articulated in *Golden* should be considered when examining the reasonableness of the planning authority's decision."

Plaintiffs essentially join in the Intervenors' conclusion by applying *Golden*'s factors to the facts of this case. The factors recited in *Golden*, as listed in *McPherson*, are as follows:

" '1. The character of the neighborhood;

" '2. the zoning and uses of properties nearby;

" '3. the suitability of the subject property for the uses to which it has been restricted;

" '4. the extent to which removal of the restrictions will detrimentally affect nearby property;

" '5. the length of time the subject property has remained vacant as zoned;

" '6. the relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner;

" '7. the recommendations of a permanent or professional planning staff; and

" '8. The conformance of the requested change to the city's master or comprehensive plan.' *Board of Johnson County Comm'rs v. City of Olathe*, 263 Kan. 667, 677, 952 P.2d 1302 (1998) (citing *Golden*, 224 Kan. at 598)." *McPherson*, 274 Kan. at 306.

In the Board's response to the Intervenors' argument, it contends that it acted legislatively because the Resolution on its face plainly applies to the County as a whole. Accordingly, the Board argues, the eight factors contained in *Golden*—a "specific tract rezoning" that the *Golden* court characterized as quasi-judicial—should not be considered in determining reasonableness.

The Board further argues that because the action was not quasi-judicial, the zoning body does not "conduct the hearing in a manner similar to a court proceeding, and then weigh the evidence presented, balance the equities, apply rules, regulations and ordinances to facts, and resolve specific issues." Instead, "the zoning body has complete discretion to do what it thinks to be best in the interests of the jurisdiction as a whole," and the decision only has to bear a rational relationship to the protection of the public safety and "general welfare of the jurisdiction."

In short, the Board argues we should apply to this case's county-wide rezoning the standards "prior to *Golden*," *i.e.*, when "the courts in Kansas reviewed all zoning decisions, even site specific rezonings as here, as legislative acts." See, *e.g.*, *Union Quarries, Inc. v. Board of County Commissioners*, 206 Kan. 268, 273, 478 P.2d 181 (1970) ("Generally speaking, the enactment and amendment of zoning regulations are primarily legislative rather than judicial in character.") The Board candidly admits that our application of the pre-*Golden* standard would benefit it greatly:

"[I]t was almost impossible for a court to overturn a legislative act, because the zoning authority was not required to clearly enunciate its reasons for that decision, and the decision could be based on policy and politics as much as facts, as long as the decision bore a reasonable relationship to the safety or welfare of the public."

The Board's position is not entirely without some basis. We independently note that 11 years after *Golden,* this court in *Landau v. City Council of Overland Park,* 244 Kan. 257, 767 P.2d 1290 (1989), acknowledged that the view expressed in its prior decision, *Arkenberg v. City of Topeka,* 197 Kan. 731, 734-35, 421 P.2d 213 (1966),

"conformed with the majority of jurisdictions which consider acts of rezoning to be legislative in character. Because of the legislative character, *rezoning decisions are given much deference and are only overturned on a showing of clear error or abuse.* 2 Rathkopf, The Law of Zoning and Planning § 27A.04 (4th ed. 1988)." (Emphasis added.) *Landau,* 244 Kan. at 271.

In the current edition of the treatise cited in *Landau,* Rathkopf's The Law of Zoning and Planning, the author elaborates. He states that "the greatest benefit of the quasi-judicial approach to rezonings is that it requires local governments . . . to engage in reasoned decision making based on articulated standards" and to "afford enhanced procedural rights to the proponents and opponents of a rezoning." 3 Rathkopf, The Law of Zoning and Planning, Rezonings: Substantive Validity and Standards for Judicial Review § 40.18, p. 40-35 (4th ed. 2005). We acknowledged the enhanced procedural rights, *i.e.,* the procedural due process benefit, in *McPherson Landfill, Inc.,* 274 Kan. at 317, where we held: "The proceedings before the Board with regard to [plaintiff's conditional use permit for 45 acres] were quasi-judicial. Thus, due process attached to the proceedings and those proceedings must have been fair, open, and impartial."

The other main benefit of a quasi-judicial characterization, closer judicial scrutiny, is further described by Rathkopf:

"Characterization of a rezoning as quasi-judicial enables reviewing courts to scrutinize the merits of a grant or denial of rezoning more closely. *Where rezonings are considered legislative, courts usually conduct their review under highly deferential standards, overturning a zoning designation only if it can be said that*

*the designation is 'arbitrary and capricious' or 'beyond the realm of fair debate.'"* (Emphasis added.) 3 Rathkopf, Rezonings: Validity and Review § 40.25, pp. 40-59 to 40-60.

As Rathkopf explains, this high degree of deference is due to the historically evolved principles of the separation of powers of the branches of government. 3 Rathkopf, Rezonings: Validity and Review § 40.6, p. 40-10.

We independently observe, however, that Kansas appellate courts have also frequently used this highly deferential language as our standard of review even in cases where governing body decisions were quasi-judicial. See, *e.g., McPherson Landfill, Inc.,* 274 Kan. at 304-05 (conditional use permit); *Board of Johnson County Comm'rs,* 263 Kan. at 681-83 (rezoning for particular tract); *Combined Investment Co., v. Board of Butler County Comm'rs,* 227 Kan. 17, 28, 605 P.2d 533 (1980) (rezoning for particular tracts).

For example, as recited earlier, those eight rules from *Golden,* 224 Kan. at 598, include the rule that clearly exemplifies one of the chief characteristics of a legislative action's highly deferential review:

Rule (6): "Action is unreasonable when it is so *arbitrary* that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness *lies outside the realm of fair debate.*" (Emphasis added.) *Combined Investment Co.,* 227 Kan. at 28.

See 3 Rathkopf, Rezonings: Validity and Review § 40.25, pp. 40-59 to 40-60 (legislative rezoning decision not overturned unless "arbitrary and capricious" or "beyond the realm of fair debate.")

Other *Golden* rules also appear to be appropriate for reviewing legislative actions. One example is Rule (3): "There is a presumption that the zoning authority acted reasonably." *Combined Investment Co.,* 227 Kan. at 28. Compare 3 Rathkopf, Rezonings: Validity and Review § 40.8, pp. 40-16 ("Since in most states rezonings are considered legislative acts they are held by courts to be entitled to a strong presumption of validity" under the separation of powers doctrine.). Other examples include Rule (1): "The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning" and Rule (5): "A court may

not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence." *Combined Investment Co.*, 227 Kan. at 28. In comparison, Rathkopf states that because rezonings generally are considered legislative acts,

"various cases stress that communities are entitled to decide for themselves how they shall be zoned or rezoned and that elected representatives from within the community are more likely than the courts to be familiar with the pertinent facts and to reflect the community's will. *In this vein, appellate courts have frequently warned trial courts against substituting their judgment for that of a community's elected representatives merely on the basis of their differing opinion as to what is the better policy in a given instance.*" (Emphasis added.) 3 Rathkopf, Rezonings: Validity and Review § 40.8, pp. 40-16 to 40-17.

In short, Kansas' approach cannot truly be labeled as purely quasi-judicial, even in specific tract zoning. Indeed, many of these *Golden* rules themselves came from *Arkenberg*, 197 Kan. 731; see *Golden*, 224 Kan. at 595-96. As mentioned, in *Landau* we later described the *Arkenberg* view as "conform[ing] with the majority of jurisdictions which consider acts of rezoning to be legislative in character." 244 Kan. at 271.

Rathkopf shares this view, based upon his examination of our decision in *Landau*. He opines that although Kansas "at one time expressly adopted a quasi-judicial characterization of individual parcel rezonings," (citing *Golden*), that Kansas, along with several other states, "subsequently either overruled or substantially limited the doctrine's application." 3 Rathkopf, Rezonings: Validity and Review § 40.20, pp. 40-43 to 40-44. Rathkopf writes:

"[L]ater decisions have made clear that the *Golden* decision has little procedural or substantive impact beyond direct judicial review and the requirement that governing bodies should henceforth supply written findings in support of their decision to grant or deny a rezoning. The standard for validity is still one of reasonableness." 3 Rathkopf, Rezonings: Validity and Review § 40.20, pp. 40-42 to 40-43 n.11 (citing *Landau*, 244 Kan. at 271.)

See also 6 Rohan, Zoning and Land Use Controls, Adoption and Amendment of Zoning Ordinances § 38.04[1], p. 38-114.9 (2007) (Kansas and other states "later rejected or substantially limited" the use of quasi-judicial doctrine, citing *Landau*).

In light of this background, we easily hold that the Board's rezoning to prohibit commercial wind farms in its entire county—approximately 800 square miles—was a legislative action. We need not now definitively decide, however, the specific parameters of our resultant standard of review. As more fully explained below, even utilizing what has been characterized as "the scope of review" and the "reasonableness factors" in quasi-judicial cases, *e.g.*, *Golden*, we hold that the Board acted reasonably.

The district court several times ordered that the Board provide more information because its basis for passing the Resolution was purportedly conclusory. Although the Board believed that at least some of the orders were unnecessary because the court had found the action was legislative, it provided findings of fact and conclusions which allegedly supported the Resolution's adoption. In eventually holding the Board's action reasonable, Judge Ireland reviewed the record and then characterized the Board's action as being based upon three factors: (1) aesthetics of the county; (2) nonconformance of the commercial wind farms with the county's Comprehensive Plan 2004; and (3) the wishes of the county's citizens.

Plaintiffs apply a number of the *Golden* zoning factors—almost none of which were addressed by Judge Ireland—to argue the Board's decision was unreasonable. However, if theoretically these factors can be applied, practically we find that many are simply of little assistance here. For example, "the character of the neighborhood," "the zoning and uses of nearby properties," and "the length of time the subject property has remained vacant as zoned" appear to have no application to a county rezoning its entire jurisdiction of approximately 800 square miles. See *Manly*, 287 Kan. at 76-77.

Indeed, we have held the *Golden* factors are nonmandatory, even in cases that are clearly quasi-judicial. As we stated in *Board of Johnson County Comm'rs*, 263 Kan. at 677: "These are suggested factors only. Other factors may be important in an individual case." See also *Landau*, 244 Kan. at 262 (*Golden* factors are suggestions). We observe that even when concerning a conditional use permit on a single tract of land, *i.e.*, clearly a quasi-judicial action, the Court of Appeals has essentially examined only aesthetics as a

factor. See *Gump Rev. Trust v. City of Wichita*, 35 Kan. App. 2d 501, Syl. ¶¶ 3, 5, 131 P.3d 1268 (2006). Aesthetics obviously is not even a *Golden* factor; at least in the "individual case" of *Gump*, aesthetics was therefore regarded as "more important" than *Golden*'s factors. *Gump*, 35 Kan. App. 2d at 509-12; see *Board of Johnson County Comm'rs*, 263 Kan. at 677.

While Intervenors join the Plaintiffs in arguing the *Golden* factors should apply, they primarily attack the three bases characterized by Judge Ireland as forming the basis for the Board's decision. We need not determine whether, as the Board argues, it also relied upon other bases, *e.g.*, commercial wind farms would harm the county infrastructure. As explained below, we hold the bases identified by Judge Ireland are sufficient to sustain the Board's action.

*Aesthetics*

As the court held in *Gump*, Kansas appellate courts have long allowed aesthetics to be considered in zoning matters. 35 Kan. App. 2d at 509-10; see, *e.g.*, *Ware v. City of Wichita*, 113 Kan. 153, 157, 214 P. 99 (1923) (recognizing in a zoning case that "[t]here is an aesthetic and cultural side of municipal development which may be fostered within reasonable limitations. [Citations omitted.] Such legislation is merely a liberalized application of the general welfare purposes of state and federal constitutions."). As our court acknowledged 60 years later: "[T]he current trend of the decisions is to permit regulation for aesthetic reasons. See *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S. Ct. 2882, 69 L. Ed. 2d 800 [1981])." *Robert L. Rieke Bldg. Co. v. City of Overland Park*, 232 Kan. 634, 642-43, 657 P.2d 1121 (1983).

In addition to our long-standing case law, we further observe that K.S.A. 12-755(a) expressly provides that "[t]he governing body may adopt zoning regulations which may include, but not be limited to, provisions which: . . . (4) control the aesthetics of redevelopment or new development." As the Court of Appeals has observed when citing this statute, "regulation of redevelopment or new development is permitted for aesthetic reasons. K.S.A. 12-755." *Blockbuster Video, Inc. v. City of Overland Park*, 24 Kan. App. 2d 358, Syl. ¶ 2, 948 P.2d 179 (1998).

Judge Ireland relied heavily on *Gump*. There, the city-county zoning code allowed construction of new communication facility towers up to 85 feet by administrative permit. According to the facts of that case, there was no prohibition against building new towers higher than 85 feet, but such towers required a conditional use permit approved by the city of Wichita.

Gump requested a conditional use permit to build a tower with an initial height of 135 feet, with a possible extension to 165 feet. The city denied the request, and Gump argued that the denial of the conditional use permit was unreasonable. The district court upheld the denial and a Court of Appeals panel affirmed, essentially holding that aesthetics alone was a reasonable basis for the city's action. See 35 Kan. App. 2d at 509-12, 515-16.

There are aesthetics considerations alleged in the instant case. The Board's Findings of Fact filed with the district court on October 6, 2006, included, *inter alia*:

"10. The facts presented at various meetings indicate that Wind Farms would likely consist of complexes of a dozen or more turbines, *located on ridge lines within the county*. A single complex could have a footprint of 7500-20,000 acres. The turbines themselves would be from 260 to over 300' tall, with blades 125' in length. The mounting pad would be 14' x 14' x 28' deep and made of concrete. The complexes could probably be seen from a distance of 20, or more miles. Wabaunsee County is approximately 30 miles, east to west, and 30 miles, north to south. The Zilkha Map (CR-270) shows potential sites that were being actively pursued by developers. These sites are located south of K-4 Highway between Alta Vista and Eskridge *along the ridge line*.

"11. *The Flint Hills of Kansas, of which Wabaunsee County is a part, contain the vast majority of the remaining Tallgrass Prairie, which once covered much of the central United States.* The Tallgrass Prairie is considered one of the most endangered ecosystems in North America.

"12. *Wind Farms could have a detrimental effect on the ecology of the area.* Prairie Chicken habitat may be altered so as to affect flight patterns, breeding grounds, nesting areas and feeding areas. Flora and Fauna may also be affected by industrial concentration of Wind Farms." (Emphasis added.)

The Board's Conclusions filed on October 6 included, *inter alia*, the following determinations regarding aesthetics and the closely related areas of ecology, flora, and fauna:

1. "The location of Wind Farms within Wabaunsee County would not be in the best interests of the general welfare of the County as a whole. In arriving at this

conclusion, the Board is mindful of the fact that 'general welfare' includes a broad spectrum of values, *including aesthetics. . . . Placing complexes of Wind Farms, of the size and scope necessary to accomplish their intended purpose, upon the ridge lines of the County would have a dramatic, and adverse, [e]ffect upon all of those general welfare issues [e.g.,* aesthetics].

2. "*. . . The size, and scope, of the proposed Wind Farms make them objectionable and unsightly,* partly as evidenced by the overwhelming opposition by the public. There is no question that the location of Wind Farms will have *an adverse effect on the scenic areas of the County. There is also evidence that their presence will have an adverse effect on wildlife.*

3. ". . . In addition to the support set forth in the preceding paragraphs, the Board would note that there was evidence presented that: . . . (b) *they* [Wind Farms] *would be harmful to the environment and the tallgrass ecosystem; . . .* [and] (d) they would have a *negative impact on wildlife.*

4. "Wind Farms would be incompatible with the rural, agricultural, and *scenic character of the County.*

. . . .

6. "Wind farms would be detrimental to property values and opportunities for agricultural and *nature based tourism. The Flint Hills are unique in their ecology, heritage and beauty.* The adverse effect Wind Farms will have on all of these things will also have an adverse effect on property values *and tourism.*" (Emphasis added.)

Judge Ireland found that "[t]here is no doubt the County looked at the aesthetics of having the wind generators as a compatible or incompatible use with the Flint Hills area." We agree, particularly when the Board has cited its finding to the record for our review. We also agree that these Board's findings could reasonably have been found to justify its decision: that the commercial wind farms would adversely, if not dramatically, affect the aesthetics of the county and for that reason should be prohibited. See *Golden v. City of Overland Park,* 224 Kan. 591, 596, 584 P.2d 130 (1978) (" '[A] court is not free to make findings of fact independent of those explicitly or implicitly found by the city governing body, but is limited to determining whether the given facts could reasonably have been found by the zoning body to justify its decision.' ").

*Nonconformance with comprehensive plan and other considerations*

More than aesthetics considerations are alleged in the instant case. The Board's submitted Findings of Fact first referenced specifics of the county's Comprehensive Plan 2004:

"9. The final adopted Plan, Wabaunsee County Comprehensive Plan 2004, includes the following goals and objectives, which were developed as a direct result of a county-wide survey and focus groups by the Plan Preparation Class:

. . . .

"b. *Maintain the rural character of the county with respect to its landscape, open spaces, scenery, peace, tranquility and solitude.*

. . . .

"d. Develop realistic plans to protect *natural resources such* as the agricultural land, *landscape, scenic views, and Flint Hills* through regulatory policy

. . .

"h. *Develop tourism programs involving* historic properties, *nature of rural character, and scenic landscape."* (Emphasis added.).

In the Board's Conclusions, it then determined that the commercial wind farms were not in conformance with the Comprehensive Plan 2004 for numerous reasons:

"5. The location of Wind Farms in Wabaunsee County would not conform to the Wabaunsee County Comprehensive Plan 2004, including the goals and objectives that were identified by the citizens of the County and incorporated as a part of the Plan. *The goals and objectives set forth in the Plan make it clear that maintaining the rural character of the County, and protecting the landscape, open spaces, scenery, peace, tranquility, and solitude of the County is of paramount important to the citizens. The size, scope and location of Wind Farms would be inconsistent with those goals."* (Emphasis added.)

Judge Ireland found that "[t]he County also looked at the comprehensive plan . . . [and] found that placing the complexes of wind farms, of the size and scope necessary to accomplish their intended purpose, would have a dramatic, and adverse, effect upon all of the general welfare issues found in the comprehensive plan." We essentially agree with the judge, particularly when the Board has cited its finding to the record for our review.

We also agree that these Board findings could reasonably have been found to justify its decision: that the commercial wind farms would not be in conformance with the Comprehensive Plan 2004, *e.g.*, to "maintain the rural character of the County with respect to its landscape, open spaces, peace, tranquility and solitude" and to "develop tourism programs involving . . . [the] nature of rural character and scenic landscape." Consequently, the commercial wind farms should be prohibited. See *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 331, 49 P.3d 522

(2002). As aesthetics have been a valid consideration for a governing body's zoning decisions since at least 1923 (see *Ware*, 113 Kan. at 157) conformance with the governing body's comprehensive plan has been a valid consideration since at least 1978. See *Golden*, 224 Kan. at 598.

*Wishes of the residents*

We agree with Judge Ireland that the Board not only took into consideration the commercial wind farms' impact upon county aesthetics and their nonconformance with the Comprehensive Plan 2004, but also considered the wishes of the citizens of Wabaunsee County. The Board's Findings of Fact reveal, *inter alia*:

"4. In December 2002, the Planning Commission conducted its first meeting to discuss the pros and cons of wind farms. The Planning Commission conducted numerous public meetings on this topic from December 2002 until June 2004. In all, between the Planning Commission and the Board, this topic was discussed, in one form or another, at approximately 54 meetings over this period.

"5. The first extensive public hearing on this issue was conducted by the Planning Commission on July 24, 2003. This meeting was well attended by the public and *a majority of the public attending expressed their opposition to allowing Wind Farms in Wabaunsee County.* . . .

. . . .

"8. On December 11, 2003, the Planning Commission conducted a public hearing on the Comprehensive Plan, and approximately 200 people attended this hearing.

"9. The final adopted Plan, Wabaunsee County Comprehensive Plan 2004, includes . . . goals and objectives, which were developed as a direct result of a county-wide survey and focus groups by the Plan Preparation Class. . . .

. . . .

"13. In public meetings where the issue of Wind Farms was discussed, *the majority of those in attendance opposed allowing them. The vast majority of letters received by the Planning Commission and the Board expressed opposition to Wind Farms.*" (Emphasis added.)

The Board's Conclusions provided to the district court included the following:

"2. . . . The size, and scope, of the proposed Wind Farms make them objectionable and unsightly, *partly as evidenced by the overwhelming opposition by the public.*

. . . .

"5. The location of Wind Farms in Wabaunsee County would not conform to the Wabaunsee County Comprehensive Plan 2004, *including the goals and objectives that were identified by the citizens of the County and incorporated as a part of the Plan.*" (Emphasis added.)

In the words of Judge Ireland, "[o]ne can review the meetings and correspondence which the County conducted in its attempt to determine the wishes of the citizens of Wabaunsee County, Kansas. A large portion of the community's wishes were against the wind farms as proposed by the plaintiffs." Based upon our own examination of the record, including those places cited in support of the Board's findings, we agree. We also agree that these Board findings, while alone insufficient, could reasonably have been found to help justify its decision. See *McPherson Landfill, Inc.*, 274 Kan. at 331.

Intervenors take particular exception, however, to either the amount of the evidence presented in support of the commercial wind farm ban based on aesthetics or to the arguably greater amount of evidence presented in opposition to the ban. For example, they state: "Granted, some of the testimony and letters cited by the Board support finding CWECS may impact the aesthetic and scenic value of the Flint Hills. Nonetheless, the record also reveals an abundance of evidence CWECS would have minimal impact." They also acknowledge the Board's reliance upon a "Memorandum Re: Industrial Scale Wind Turbine Development Presented by the Tallgrass Ranchers, "which states that a landscape architect/attorney "has analyzed the visual impact of wind turbine complexes and . . . determined that they would be harmful to the stability and identity of the Flint Hills." But Intervenors then argue that a power point exhibit referenced in the Tallgrass Memorandum was not included. As a result, the Intervenors conclude that "[a] reasonable zoning regulation would have accounted for the conflicting views by acknowledging CWECS can be placed in areas in which the current aesthetics would not be negatively impacted."

Intervenors misunderstand our limited review on this issue. Even if the Board's action were quasi-judicial, we would still be limited to determining whether the given facts could reasonably have been found by the Board to justify its decision. *McPherson*

*Landfill, Inc.*, 274 Kan. at 331. We could not substitute our judgment for that of the Board, and we should "not declare the action unreasonable unless *clearly compelled to do so by the evidence.*" (Emphasis added.) *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.3d 533 (1980).

The Intervenors also take exception to the Board's reliance upon the alleged nonconformance with the Comprehensive Plan 2004. They again, however, appear to make an argument that would require us to reweigh the evidence presented there. For example, they argue that the "Board's Findings of Fact cites testimony from the July 24, 2003, Planning Commission hearing of Roger Badeker and Larry Patton as evidence that CWECS would not conform to the . . . Comprehensive Plan 2004." They acknowledge "these individuals concluded these systems were not consistent with the Comprehensive Plan" but argue "their statements are mere conclusions and not actual evidence of nonconformance."

We must again disagree. Intervenors take no exception to the fact that these individuals provided testimony. Accordingly, their testimony is obviously evidence. Moreover, Badeker has written professionally on the subject of zoning. Consequently, the Board may have considered his "mere conclusions" as carrying additional weight, *i.e.*, approaching that of an expert witness. See Badeker, *"Tell it to the Judge: Appealing a Zoning Decision."* 67 J.K.B.A. 33 (September 1998); K.S.A. 60-456 on expert witnesses. In any event, this testimony clearly supports the Board's finding of fact which could reasonably have been found by the Board to justify its decision: that the commercial wind farms were inconsistent with the Comprehensive Plan 2004 and therefore should be prohibited.

The Intervenors also take particular exception to the third factor relied upon by the Board as characterized by Judge Ireland: the concerns of county residents. Intervenors point out that the evidence reveals that some residents were for the commercial wind farms, others were against. They acknowledge that the Board should consider the objections of county residents but, quoting *Gump*, 35 Kan. App. 2d at 511, argue that " '[z]oning is not to be based upon a plebiscite of the neighbors.' " Intervenors argue that " 'although their wishes are to be considered, the final ruling is to

be governed by consideration of the benefit or harm involved to the community at large.' " *Gump*, 35 Kan. App. 2d at 511. They argue the Board did not consider the community at large because it failed to consider "the impact upon [the] parties seeking to take advantage of their property rights."

Judge Ireland found that after reviewing the documents and the minutes of numerous meetings in the record, "the pros and cons of wind farms were discussed." He concluded that "the County has taken into account the benefit or harm involved to the community at large." We agree, and reject the position of the Intervenors.

Overall, we must acknowledge that several key points of appellate review dictate our result. We recognize that the Board—and not the court—has the right to change the zoning; that there is a presumption that the Board acted reasonably; that the Plaintiffs and Intervenors have the burden of proving the unreasonableness by a preponderance of the evidence; that this court may not substitute its judgment for the Board and should not declare the zoning amendment unreasonable unless *clearly* compelled to do so by the evidence; and that an act is unreasonable when "it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate." *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan.17, 28, 605 P.2d 533 (1980). With these precepts in mind, we cannot hold that the Plaintiffs and Intervenors have met their burden of showing the Board acted unreasonably. See *Board of Johnson County Comm'rs v. City of Olathe*, 263 Kan. 667, 683, 952 P.2d 1302 (1998) (reciting and applying many of these precepts to reverse trial court's holding of unreasonableness).

Finally, Plaintiffs' and Intervenors' repeated arguments that a county-wide ban on all commercial wind farms was unreasonable implies that the overall scope of the ban was somehow unreasonable *per se* and therefore improper.

We acknowledge that some, mainly older, authority appears to support this view. One commentator has stated: "Generally, it is *unwise* to enact provisions that will exclude lawful occupation or

use from an entire township or city." (Emphasis added.) 1 Yokley, Zoning Law and Practice § 3-14[e], p. 3-158 (4th ed. 1978). The treatise cites several cases, including *Gust v. Township of Canton*, 342 Mich. 436, 70 N.W.2d 772 (1955) (disallowing the prohibition of trailer camps anywhere in the township); see also Mandelker, Land Use Law § 5.37 (5th ed. 2003) (citing cases).

The contrary view is also acknowledged in Mandelker, Land Use Law § 5.37, p. 5-38. That treatise recognizes that a total ban can be appropriate: "Courts review the total exclusion of one type of commercial use from a community on a case-by-case basis to decide whether the exclusion advances legitimate zoning purposes." See, *e.g.*, *Beacon Falls v. Posick*, 212 Conn. 570, 583, 563 A.2d 285 (1989) ("Connecticut courts have upheld prohibitions of certain activities within municipalities through zoning after determining that the prohibitions were rationally related to the protection of the municipalities' public safety, health and general welfare."); see also *Lambros, Inc. v. Town of Ocean Ridge, Fla.*, 392 So. 2d 993, 994 (Fla. 1981) ("The appellate courts in Florida have acknowledged the authority of a municipality to exclude certain uses of property entirely from a city."). We observe that in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536 (1974), the United States Supreme Court upheld a zoning ordinance that restricted land use to one-family dwellings for an entire village of 700 people.

In our view, however, the situation in the instant case does not involve such an absolute: The Board is allowing *some* wind farms, *i.e.*, small ones, and disallowing only the large, commercial wind farms.

The Kansas Legislature indicates that such distinctions can be validly made. K.S.A. 12-753(a) states:

"The . . . board of county commissioners of any county, by adoption of a resolution, may provide for the adoption or amendment of zoning regulations in the manner provided by this act. . . . Such regulations may include, but not be limited to, *provisions restricting and regulating the height, number of stories and size of buildings; the percentage of each lot that may be occupied; the size of yards*, courts and other open spaces; . . . *the location, use and appearance of buildings, structures and land for residential, commercial, industrial and other purposes*; the conservation of natural resources, including agricultural land; and the use of land

located in areas designated as flood plains and other areas, including the distance of any buildings and structures from a street or highway."

Here, as authorized by K.S.A. 12-753(a), the Board has restricted sizes. More particularly, it allows a *"Small* Wind Energy Conversion System" (SWECS) consisting of a wind turbine, a tower and controls, which has a rated capacity of not more than 100 kilowatt and which is less than 120 feet in height and intended solely to reduce on-site consumption of purchased utility power. See Zoning Regulations, Article 1-104 (210); Article 31-109(i), (f).

By contrast, the Board has disallowed systems that exceed 100 kilowatt, exceed 120 feet in height, or that consist of more than one system of any size proposed or constructed by the same person or group of persons on the same or adjoining parcels or as a unified or single generating system. Zoning Regulations, Article 1-104 (208); Article 31-112(5). Consistent with this statutory authority, the Board further limits the small wind energy conversion systems by specifying parcel size, density, spacing, setback distance, blade height and advertising.

As for any argument that the important distinction is based not upon size, but rather upon commercial versus noncommercial, *i.e.*, so that any-sized commercial system is banned, we nevertheless believe that such a distinction, and therefore such restriction, is valid. See *Beacon Falls,* 212 Conn. at 584, and cases cited there from various jurisdictions.

In sum, the Plaintiffs and Intervenors have not established that the Board acted unreasonably in amending its zoning regulations to prohibit commercial wind farms in its county.

Issue 3. *The district court did not err in precluding Plaintiffs and Intervenors from conducting discovery or submitting evidence.*

Plaintiffs and Intervenors next argue that the district court abused its discretion in applying the discovery and evidentiary standards for determining the reasonableness of a zoning decision. Between them they generally place their complaints about the district court in three categories: (1) granting a protective order denying them the right to take the county commissioners' depositions; (2) refusing to consider or accept as evidence anything other than in-

formation submitted by the county; and (3) permitting the county to "manufacture evidence and reasons for its decision over two years after it adopted the zoning amendment."

We begin by observing that the apparent basis for Judge Klinginsmith's denial of the request to depose the commissioners was because he embraced the Board's argument that their decision was legislative. We know that the Board argued the depositions should be prohibited because the commissioners were elected officials making a legislative decision; that the judge held that the decision was legislative; and that he then barred the depositions. As was earlier discussed, we agree with this labeling because the zoning amendment concerned the entire county of approximately 800 square miles. See Mandelker, Land Use Law § 6.69, p. 6-83 ("Comprehensive rezoning is legislative . . . in a majority of states."); *Landau v. City Council of Overland Park*, 244 Kan. 257. 271-72, 767 P.2d 1290 (1989) (acknowledging the change in character from legislative to quasi-judicial for specific tract rezoning in *Golden*, 224 Kan. 591, in 1978).

We acknowledge that taking the depositions of the elected members of a governing body who made a legislative decision to comprehensively rezone could arguably violate the separation of powers. As mentioned, the high degree of deference afforded by a court to a legislative decision is due to the historically evolved principles of the separation of powers of the branches of government. 3 Rathkopf, Rezonings: Validity and Review § 40.6, p. 40-10. Accordingly, it is not totally unwarranted for Judge Klinginsmith to believe that these legislatively acting commissioners could not be deposed. *Cf.* Kan. Const., art. 2, § 22 ("For any speech, written document or debate in either house, the [legislative] members shall not be questioned elsewhere.")

As the Plaintiffs and Intervenors also essentially acknowledge, the district court is vested with broad discretion in supervising the course and scope of discovery. *In re Care & Treatment of Hay*, 263 Kan. 822, 839, 953 P.2d 666 (1998). Accordingly, Plaintiffs admit that the issuance of a discovery protective order-here, prohibiting the commissioners' depositions—is within the discretion of the district court. See *In re Tax Appeal of City of Wichita*, 277 Kan. 487,

513, 86 P.3d 513 (2004) ("Orders concerning discovery will not be disturbed on appeal in the absence of a clear abuse of discretion.") They also acknowledge that the admission of evidence in the district court in such proceedings is within the court's discretion. *Landau*, 244 Kan. 257, Syl.¶ 5; *Combined Investment Co. v. Bd. of Butler County Comm'rs*, 227 Kan. 17, 27, 605 P.2d 533 (1980) ("Records of prior proceedings and also relevant evidence not presented to the commission are admissible subject to judicial discretion.").

They point out, however, that the county commissioners were allowed to be deposed in *Landau* and *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 49 P.3d 522 (2002). They also argue that where some indication of a commissioner's prejudgment of the issue is present, as they allege here, discovery has been allowed, citing *Tri-County Concerned Citizens, Inc. v. Board of Harper County Comm'rs*, 32 Kan. App. 2d 1168, 95 P.3d 1012 (2004). The fundamental difference between those cases and the instant case is that their governing bodies were making quasi-judicial decisions, not legislative. *Landau* concerned a denial of a request to rezone 16 acres; *McPherson* and *Tri-County* concerned conditional or special use permits for a landfill.

The Plaintiffs and Intervenors also argue that they were not permitted to provide input, *i.e.*, the district court refused to consider or accept as evidence anything other than information submitted by the county. The Board correctly points out that they were allowed to submit verbatim transcripts on four meetings of the planning commission held in the spring and summer of 2004, where a court reporter was present. More important, they fail to appreciate the fundamental nature of a court's review of a Board's legislative action. One commentator goes so far as to state that governing bodies performing legislative functions do not even have to make findings of fact or give reasons for their zoning decisions. Mandelker, Land Use Law § 6.26, p. 6-28. The complaining parties' limited rights are also demonstrated in the quasi-judicial case of *Landau*, 244 Kan. at 274. There, the court held that if the trial court believed the findings of fact and conclusions of law are deficient and inadequate for a reasonableness determination, the

court may "select the alternative of remanding the case *to the local governing authority for further findings and conclusions.*" (Emphasis added.) *Landau* does not give the opposing party the right to participate in drafting the Board's findings and conclusions.

Nor does *Landau* give the complaining party the absolute right to provide input to the court. We acknowledge Intervenors' position that the *Landau* court rejected the city's cross-appeal that essentially contended, as a matter of law, that the court was limited to reviewing the administrative record in making its reasonableness determination. See 244 Kan. at 274. We also acknowledge the accuracy of their reference to *Landau* which states that, as a result, "additional evidence may be considered by the trial court when reviewing a zoning decision providing the additional evidence meets the requirements of relevancy as to the issue of reasonableness." *Landau*, 244 Kan. at 271. We again point out, however, that the admission of such evidence in these proceedings is within the discretion of the district court. *Combined Investment Co.*, 227 Kan. at 27.

The Plaintiffs and Intervenors also argue the district court permitted the county to manufacture evidence and reasons for its decision over 2 years after it adopted the zoning amendment. We first note that they again fail to appreciate the nature of a court's review of a Board's legislative action. As stated, drafting the findings and conclusions for the court is the Board's function. See *Landau*, 244 Kan. at 274. Moreover, absent the order by Judge Klinginsmith, formal findings of fact are not required, even in a quasi-judicial matter. See *McPherson Landfill, Inc.*, 274 Kan. at 322. As that court stated: "It is more important that there exists a record of what the Board considered before making its decision so that the reviewing court is not left in a 'quandary' as to why the decision was made." 274 Kan. at 323 (citing *Board of Johnson County Comm'rs v. City of Olathe*, 263 Kan. 667, 679, 952 P.2d 1302 [1998]). We next note that in *McPherson Landfill, Inc.*, the company that received a denial of its application for a conditional use permit complained that the Board failed to make timely formal findings of fact: approximately 4 months elapsed from the time of the Board's quasi-judicial decision until drafted. The court favor-

ably compared the situation to *Landau*, 244 Kan. 257, where the findings of fact in that quasi-judicial case (rezoning application for 16 acres) were not made until 6 months after the decision by the governing body and after an appeal had been filed. The *Landau* court was nevertheless able to determine that several *Golden* factors had been considered. It also noted that the meeting minutes showed that the citizens' views at the public hearing addressed additional *Golden* factors.

The *McPherson Landfill* court concluded that, as in *Landau*, the citizen's views addressed additional *Golden* factors. As in *Landau*, the record did not leave the *McPherson Landfill* court in a "quandary" as to what motivated the Board to act. The court also rejected the argument that the findings were inadequate because they were made after the Board's decision was made. *McPherson Landfill, Inc.*, 274 Kan. at 323.

We fully recognize that we may not have made the identical decisions as did the district court. However, we cannot declare that it abused its discretion, particularly when addressing a legislative decision by elected county commissioners. See *Vorhees v. Baltazar*, 283 Kan. 389, 393, 153 P.3d 1227 (2007) (discretion is abused when no reasonable person would take the view adopted by the district court). The salient point for any court is that it not be left in a quandary from the record as to the bases for the Board decision. *McPherson Landfill Inc.*, 274 Kan. at 323.

Here, Judge Ireland clearly was not in a quandary, based upon his review and conclusions. According to his February 28, 2007, Memorandum Decision, he reviewed the "certified record" of 388 pages. He concluded that the county's findings of fact demonstrated which documents found in the record were considered by the county in its decision: "[T]he county has complied with Judge Klinginsmith's remand to identify each fact they relied upon in making their decision regarding zoning." As mentioned, the findings of fact are cited to the record. Moreover, the legitimacy of the given reasons is further supported by Commissioner Steuwe. Although he had voted against the Resolution, he nevertheless supported "the motion to adopt the document presented [Findings of Fact and Conclusions of Board] because I believe it sets forth the

facts and conclusions that were relied upon by a majority of the Commission when it voted 2-1 in favor of the resolution to ban industrial wind turbines in Wabaunsee County."

After review of the record, which Judge Ireland found revealed that the "pros and cons of wind farms were discussed," he seized upon several of the Board's given reasons which he felt predominated: banning commercial wind farms because of aesthetics and nonconformance with the Comprehensive Plan 2004. There was no judicial quandary.

On a closely related issue, Plaintiffs specifically argue that Judge Ireland erred in dismissing their claim alleging unreasonable action because a court cannot determine reasonableness under K.S.A. 12-760 without facts. And Plaintiffs were not allowed to discover, or provide to the court, any facts.

Their argument appears to proceed as follows. First, because Judge Ireland considered matters outside of the pleadings, *e.g.*, the certified record, the motion to dismiss this claim is more properly characterized as a motion for summary judgment. See K.S.A. 60-212(b)(6). Second, they argue that summary judgment "ordinarily" cannot be granted without discovery. See *Bell v. Kansas City, Kansas Housing Authority*, 268 Kan. 208, 220, 992 P.2d 1233 (1999) ("Ordinarily, summary judgment should not be granted when discovery is incomplete."). Third, without considering these yet-undiscovered facts, a court cannot make a reasonableness determination under K.S.A. 12-760. Fourth, the judgment on this claim therefore must be reversed and the matter remanded.

We return to our earlier response. The district court judges considered the Plaintiffs' position to be an attack on a legislative decision made by elected officials. Additionally, the issue before the court was narrow: reasonableness. The evidence needed under the court's limited standard of review to examine this particular type of attack on the decision was likewise limited. The record before the court clearly did not leave the court in a quandary as to why the Board's decision was made.

Issue 4: *The district court did not err in dismissing the claim alleging that the zoning amendment violated the Contract Clause.*

Plaintiffs and Intervenors next briefly argue that Judge Klinginsmith erred in dismissing as a matter of law their claim alleging

violation of the Contract Clause of the United States Constitution, U.S. Const., Art. 1, § 10, cl. 1. Plaintiffs contend that they entered into wind leases prior to the adoption of the Board's ban and that the county cannot pass a law that interferes with the enforcement of a contract. They set forth the standard expressed in *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983), and summarily conclude their contractual rights were impaired. They do not discuss how.

Intervenors argue that the Board's action was intended to frustrate the purpose of the contract. Like the Plaintiffs, they set forth the *Energy Reserves Group* standard but, unlike the Plaintiffs, do argue how that standard was allegedly met.

The Board provides numerous responses and cites a number of cases dealing with issues identical, or similar, to those in the instant case. We need not address all of its arguments; several will resolve the parties' controversy.

We begin our analysis with the standard upon which all parties agree:

" 'The test for determining whether a state law violates the Contract Clause of the United States Constitution is: (1) whether the state law has, in fact, operated as a substantial impairment of a contractual relationship; (2) whether there is a significant and legitimate public purpose behind the legislation; and (3) whether the adjustment of the contracting parties' rights and responsibilities is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.' " *U.S.D. No. 443 v. Kansas State Board of Education*, 266 Kan. 75, 84, 966 P.2d 68 (1998) (quoting *Federal Land Bank of Wichita v. Bott*, 240 Kan. 624, Syl. ¶ 4, 732 P.2d 710 (1987) (in turn relying, in part, upon, *Energy Reserves Group*, 459 U.S. 400).

If an impairment is not substantial, our analysis ends and there is no violation of the Contract Clause. See *U.S.D. No. 443*, 266 Kan. at 79; *729, Inc. v. Kenton County Fiscal Court*, 515 F.3d 485, 493-94 (6th Cir. 2008); *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005); *Flanigan's Enterprises, Inc. v. Fulton County, Ga.*, 242 F.3d 976 (11th Cir. 2001). If the impairment is substantial, the legislation may still be upheld provided both other conditions are met. See *U.S.D. No. 443*, 266 Kan. at 85 (citing *Bott*, 240 Kan. at 636); *Keystone Bituminous Coal Assn. v. DeBenedictis*,

480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987); *CFCU Community Credit Union v. Hayward*, 552 F.3d 253, 267-68 (2d Cir. 2009); *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086 (9th Cir. 2003).

The Supreme Court has articulated other considerations when dealing with the Contract Clause issue. "Although the language of the Contract Clause is facially absolute ['No State shall . . . pass any . . . Law impairing the Obligation of Contracts'] its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of the people.' [Citation omitted.]" *Energy Reserves Group*, 459 U.S. at 410; see *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241-42, 57 L. Ed. 2d 727, 98 S. Ct. 2716, *reh. denied* 439 U.S. 886 (1978) (general listing of these interests protected under the police power, including lives, health, morals, comfort, and general welfare of the people).

On the threshold issue of whether a regulation has, in fact, operated as a substantial impairment of a contractual relationship, the Court has stated: "In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. [Citations omitted.]" *Energy Reserves Group*, 459 U.S. at 411. This is because " '[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.' " [Citation omitted.] 459 U.S. at 411.

Next, "[i]f the regulation does constitute a substantial impairment, then the State, in justification, must have a significant and legitimate public purpose behind the regulation, [citation omitted] such as the remedying of a broad and general social or economic problem." 459 U.S. at 411. The *Energy Reserves Group* Court held that "[t]he requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." 459 U.S. at 412.

For the third step, *i.e.*, whether the adjustment (or impairment—see *Bott*, 240 Kan. at 636-37) of rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption, the Court noted that its standard of review de-

pended upon whether the State was a party to the contract and altered its own contractual obligations:

"Unless the State itself is a contracting party, [citation omitted], . . . '[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' [Citation omitted.]" 459 U.S. at 412-13.

See also *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 505, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987) ("[W]e have repeatedly held that unless the State is itself a contracting party, courts should 'properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' [Citation omitted.] . . . We refuse to second-guess the Commonwealth's determinations that these are the most appropriate ways of dealing with the problem.").

The *Energy Resources Group* Court held that the Kansas Natural Gas Price Protection Act, K.S.A. 55-1401 *et seq.*, did not violate the Contract Clause. In holding that the Act did not substantially impair the contractual rights of Energy Resources Group (ERG), the Court noted: "Significant here is the fact that the parties are operating in a heavily regulated industry," *i.e.*, regulation of natural gas. 459 U.S. at 413. It further held that "[t]o the extent, if any, the Kansas Act impaired ERG's contractual interests", the Act was prompted by "significant and legitimate state interests. Kansas has exercised its police power to protect consumers from the escalation of natural gas prices caused by deregulation." 459 U.S. at 416-17. In short, "[t]here can be little doubt about the legitimate public purpose behind the Act." 459 U.S. at 417. As for the third step, the Court stated: "Nor are the means chosen to implement these purposes deficient, *particularly in light of the deference to which the Kansas Legislature's judgment is entitled.*" (Emphasis added.) 459 U.S. at 418.

Here, even without further factual development, we hold for the Board. First, when considering whether a contractual relationship is substantially impaired, we focus on whether the subject matter of the contract is regulated. We observe that the land use field is heavily regulated in Kansas. See, *e.g.*, K.S.A. 12-701 *et seq*. Addi-

tionally, as more fully discussed later on the issue of state preemption, Intervenors themselves argue that commercial power, *e.g.*, electric power, is also regulated by the Kansas Corporation Commission. When regulation already exists, it is foreseeable that changes in the law may alter contractual obligations. See *Energy Reserves Group*, 459 U.S. at 416. Accordingly, we can find no substantial impairment. See also *Schenck v. City of Hudson*, 997 F. Supp. 902, 907 (N.D. Ohio 1998) *affd without opinion*, 208 F.3d 215 (6th Cir. 2000) ("Land use and building regulation have long existed in [the town]. Plaintiffs entered their contracts aware that government regularly affected zoning and building issues."); *Kittery Retail Ventures, LLC v. Town of Kittery*, 856 A.2d 1183, 1195 (Me. 2004) (Contractual relationships not substantially impaired in rezoning case because "[i]n Maine, land use is an area that has traditionally been regulated by the state and municipalities.").

We also note that according to the dates provided in the briefs of Plaintiffs and Intervenors, all of their relevant contracts were entered into after the Board had declared its first moratorium in November 2002. Accordingly, they were on notice that Board action could be taken contrary to their future contracts. *Cf. Energy Reserves Group*, 459 U.S. at 416 (Contract provision suggested "that ERG knew its contractual rights were subject to alteration by state price regulation. Price regulation existed and was foreseeable as the type of law that would alter contract obligations."); *Alliance of Auto. Mfrs.*, 430 F.3d at 42 (Contracts entered into after the law was passed were not substantially impaired because they were "executed with the knowledge and expectation of pervasive state regulation.").

Second, even assuming that the Resolution substantially impaired the contractual interests, we hold that it served significant public purposes. These purposes included "aesthetics" and consistency with the county's comprehensive plan and, although not relied upon by the district court, also the environmental, ecological, and surface and subsurface water concerns expressed by the Board as bases for its Resolution. See *Northwestern Nat. Life Ins. Co. v. Tahoe Regional*, 632 F.2d 104, 105 (9th Cir. 1980) (under a Contract Clause analysis, court noted that restrictive zoning to dis-

courage urbanization of open areas is legitimate exercise of state's police power.); *Schenck*, 997 F. Supp. at 907 ("Land use is a legitimate matter of concern for [town]."); *cf. Keystone Bituminous Coal Assn.*, 480 U.S. at 505 (The State's "strong public interest" in the environment "transcend[ed] any private agreement between contracting parties.").

Third, the means chosen by the Board to implement these significant public purposes are not deficient, *i.e.*, they are reasonable and necessary. See *U.S.D. No. 443*, 266 Kan. at 79; see also *Keystone Bituminous Coal Assn.*, 480 U.S. at 505. In forming this conclusion, we are guided by the Supreme Court's acknowledgment that "courts should ' "properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." ' [Citation omitted.]" 480 U.S. at 505. The evidence in the record reveals that the Board has drawn a reasonable line—based in part upon size, power, and use—between those wind farms that are allowed and those that are not. See, *e.g., Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999) (Court deferred to town council's judgment that the waste management system created by the ordinance was a "moderate course designed to achieve the permissible purposes stated in the ordinance's preamble."). Like the United States Supreme Court in *Keystone Bituminous Coal Assn.*, 480 U.S. at 505, "[w]e refuse to second-guess" the Board's "determinations that these are the most appropriate ways of dealing with the problem."

We find one of the Board's many cited cases to be particularly on point: *Schenck*, 997 F. Supp. 902. In *Schenck*, developers and homeowners appealed an entry of summary judgment on their claim alleging a town's violation of the Contract Clause. More specifically, the town had passed a zoning ordinance pursuant to its plan for land use, which included a limitation on town growth. Some developers joined other plaintiffs and sued because they did not receive allotments for constructing housing on town lots in the town's lottery. These particular developers complained that the ordinance impaired their contract rights because they would be unable to repay loans incurred to build streets and other improvements in their subdivisions.

The *Schenck* court first noted that the Contract Clause does not operate to obliterate the police power of the States:

" 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. *This power, which in its various ramifications is known as the police power is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.'* " (Emphasis added.) 997 F. Supp. at 907 (quoting *Manigault v. Springs,* 199 U.S. 473, 480, 50 L. Ed. 274, 26 S. Ct. 127 (1905).

See *Keystone Bituminous Coal Assn.,* 480 U.S. at 503.

It then recited the three-step test from *Energy Reserves Group.* Citing that case, the court observed that for the first step, determining whether the legislation has, in fact, operated as a substantial impairment of a contractual obligation, "this court needs to consider whether the industry the complaining party has entered has been regulated in the past." *Schenck,* 997 F. Supp. at 907 (citing *Energy Reserves Group,* 459 U.S. at 411.) It noted that "[l]and use and building regulation have long existed in [the town]. Plaintiffs entered their contracts aware that government regularly affected zoning and building issues. In such circumstances, the government has greater discretion in legislating even where such legislation may affect contract rights. [Citation omitted.]" *Schenck,* 997 F. Supp. at 907. Accordingly, the court appeared to hold that there was no substantial impairment of contract rights.

For the next step, determining whether the State has a significant and legitimate public purpose behind the legislation, the *Schenck* court then held that land use was "a legitimate matter of concern for [the town]." 997 F. Supp. at 907. As for the third step, the court also acknowledged that if the State advances a sufficient public purpose, the " 'courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " 997 F. Supp. at 907 (quoting *Keystone Bituminous Coal Assn.,* 480 U.S. at 505). "Even if there is a substantial impairment, the state retains the right to remedy broad and general social or economic

problems." *Schenck* 997 F. Supp at 907 (citing *Allied Structural Steel Co.*, 438 U.S. at 247). The court then held that "the zoning at issue here is a proper exercise of the City's police power," *Schenck*, 997 F. Supp. at 907 (citing *Schenck v. City of Hudson*, 114 F.3d 590, 595 [6th Cir. 1997]). Accordingly, the *Schenck* court appeared to hold that the zoning was necessary and reasonable.

INTERVENORS' ADDITIONAL ISSUES:

Intervenors joined the Plaintiffs in their earlier arguments; they also make several unique to themselves.

Issue 5: *The district court did not err in dismissing Intervenors' claim alleging preemption by state law.*

Intervenors argue that Judge Klinginsmith erred in dismissing their claim and holding as a matter of law that the county zoning regulation was not preempted by the Kansas Electric Public Utilities Act (KEPUA), K.S.A. 66-101 *et seq.* He held that KEPUA was only meant to preempt local zoning in two situations: (1) the placement or siting of nuclear power plants; and (2) the placement or siting of electrical transmission lines of a certain size. According to the judge, because there was no clear expression of intent to regulate commercial wind farms, KEPUA did not preempt the Board's actions.

Intervenors argue that the authority of the Kansas Corporation Commission (KCC) to regulate electric public utilities is extremely broad and that it has the exclusive power to regulate commercial wind farms. As they summarize their discussion of this issue in their brief, "the KEPUA preempts the Board's authority to completely ban CWECS within Wabaunsee County." They specifically assert that the KCC's preemption is "clearly stated" by the legislature or, in the alternative, implied by KEPUA.

The Board essentially adopts the rationale of Judge Klinginsmith: the Intervenors cannot show that the legislature clearly intended to preempt all local regulation and reserve exclusive jurisdiction for the State. It contends that a legislative regulatory scheme of a particular field, as here, does not necessarily bar a county from adopting zoning regulations affecting that field.

Our review of this issue is unlimited because whether a resolution is preempted by statute is a question of law, as is the interpretation of statutes and resolutions. See *Steffes v. City of Lawrence*, 284 Kan. 380, 385, 160 P.3d 843 (2007).

This court has routinely, if not always clearly and consistently, rejected the argument that state law preemption of a particular field can be implied rather than expressed by a clear statement in the law. See, *e.g.*, *City of Junction City v. Griffin*, 227 Kan. 332, 336, 607 P.2d 459 (1980); *City of Junction City v. Lee*, 216 Kan. 495, Syl. ¶ 9, 532 P.2d 1292 (1975) (legislative intent to reserve to the state exclusive jurisdiction to regulate must be clearly manifested by statute). Based upon our review of KEPUA, we agree with Judge Klinginsmith that the legislature did not include clear language in the statutory scheme to preempt the Board's ability to amend its zoning regulations in the instant case. Contrast, *e.g.*, K.S.A. 79-4702 ("The power to regulate, license, and tax the management, operation and conduct of and participation in games of bingo is hereby vested exclusively in the state.").

Like Judge Klinginsmith, we also observe that the legislature has defined two specific circumstances when state-level regulation by the KCC does preempt local zoning. The first is the placement or siting of nuclear power plants. K.S.A. 66-1,162 provides:

"Upon the issuance of such permit [by the KCC], no local ordinance, resolution or regulation shall prohibit the construction of the nuclear generation facility, and the electric utility may proceed with such facility notwithstanding any requirement to obtain any building permit under any local zoning ordinance, resolution or regulation."

The second specific preemption is the placement or siting of electricity transmission lines above a certain size. According to K.S.A. 66-1,182(b): "No city or county shall have jurisdiction or control over the siting or construction of any electric transmission line exempted from the provisions of this act by subsection (a)".

As Judge Klinginsmith reasoned, if the legislature had truly intended for the State to preempt all local authority regarding such public utilities, there would be no need for these two specific preemptions. See *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 631, 132 P.3d 870 (2006) (" 'There is a presumption that the

legislature does not intend to enact useless or meaningless legislation.' ").

Moreover, even if this court were to wholly embrace the doctrine of "implied preemption" by state law, Intervenors could not prevail. Once the legislature has *expressly* stated that no local governing bodies will have jurisdiction in only two specific areas of a statutory scheme, we find it difficult to *imply* the existence of any other areas where they have no jurisdiction. *Cf. Cole v. Mayans*, 276 Kan. 866, 878, 80 P.3d 384 (2003) (We can presume that when the legislature expressly includes specific terms it intends to exclude terms not expressly included.). Implying preemption is further unlikely when we additionally observe that the legislature has also expressly prohibited counties from regulating the production and drilling of any oil or gas well "which would result in the duplication of regulation by the state corporation commission." (Emphasis added.) See K.S.A. 19-101a(a)(19). That statute also expressly prohibits counties from requiring any license, permit, fee, or charge for the drilling or production of any oil or gas well. In short, the legislature has demonstrated that it knows how to preempt with the KCC. Its failure to do so in our scenario strongly suggests it did not so intend.

In sum, KEPUA does not preempt the Board's ability to amend its zoning regulations to prohibit commercial wind farms.

Issue 6: *The district court did not err in dismissing Intervenors' claim alleging preemption by federal law.*

Intervenors next argue that Judge Klinginsmith erred in dismissing their claim and holding as a matter of law that the county zoning regulation was not preempted by the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 2601 (2000), *et seq*. As mentioned, preemption is a question of law over which we exercise de novo review. *Steffes*, 284 Kan. at 380.

We articulated several additional standards relevant to our review of this issue in *Doty v. Frontier Communications, Inc.*, 272 Kan. 880, Syl. ¶ 4, 36 P.3d 250 (2001):

"Absent an express statement by Congress that state law is preempted [, federal] preemption occurs where [1] there is an actual conflict between federal and state

law; [2] where compliance with both federal and state law is, in effect, physically impossible; [3] where Congress has occupied the entire field of regulation and leaves no room for states to supplement federal law; or [4] when the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress."

Intervenors admit that Congress has not made an express statement of preemption. We therefore start our analysis with an acknowledgment that "[i]n the absence of express preemption in a federal law, there is a strong presumption that Congress did not intend to displace state law." *Doty*, 272 Kan. 880, Syl. ¶ 5; see also *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 131 L. Ed. 2d 695, 115 S. Ct. 1671 (1995) ("[D]espite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law.").

Intervenors appear to make two basic arguments. First, they contend that "federal law regulating wind energy is so pervasive, it can reasonably be inferred that Congress did not leave room for states to supplement it." Perhaps stated another way, they argue: "Given that the federal government has exercised such a purview into the area of wind energy, Kansas is implicitly prohibited from legislating in this area. When federal law occupies a field, it pre-empts state action in that area."

We observe that Intervenors cite five laws to purportedly demonstrate the federal government's "extensive reach into the area of wind energy," *e.g.*, The Energy Policy Act of 2005, 42 U.S.C. § 15801 (2006) *et seq*. However, they do not explain how; they merely list. In our view, this approach is insufficient to overcome the strong presumption that Congress did not intend to displace state law. See *Doty*, 272 Kan. 880, Syl. ¶ 5.

Second, Intervenors point out that following the adoption of PURPA in 1978, the Kansas Legislature enacted K.S.A. 66-1,185, which gave the KCC the jurisdiction required to comply with and carry out the requirements of PURPA. They argue that PURPA therefore sets forth a "shared regulatory scheme" between the state

and federal governments. Consequently, they conclude that "to the extent regulatory authority over utility generating power within the State is retained by the State, the legislature has clearly stated that authority over electric generation is vested in the KCC," citing K.S.A. 66-101 *et seq.*

Intervenors implicitly acknowledge, however, that this argument is based upon their contention that "the State of Kansas has exclusively regulated electric public utilities since the early 1900's." Since we earlier held that the county's zoning regulation amendment was not preempted by state law because Intervenors had not demonstrated that the KCC had exclusive jurisdiction, we must reject this second argument.

Judge Klinginsmith properly held that PURPA did not preempt local zoning of commercial wind farms.

## BOARD'S ISSUE ON CROSS-APPEAL:

Issue 7: *The Intervenors' action under K.S.A. 12-760(a) was commenced in a timely manner.*

On cross-appeal, the Board contends that Intervenors' appeal should be dismissed because their petition to intervene was untimely filed. The Board points out that the Resolution was adopted on June 24, 2004, and contends that K.S.A. 12-760(a) requires that the intervention—like the Plaintiffs' petition—be commenced within 30 days, *i.e.*, by late July, 2004. It emphasizes that the Intervenors did not file a motion to intervene until more than 1 year later, August 1, 2005, and their petition was not filed until August 17, 2005. The Board concludes that the district court therefore had no jurisdiction to allow the intervention.

Intervenors respond that in *Maurer v. Miller*, 77 Kan. 92, 96-97, 93 P. 596 (1908), the court held that the 2-year statute of limitations was no defense to an intervening petition when the original action contesting a will commenced within 2 years because the will was indivisible and the original action inured to the benefit of the Intervenors.

We observe that in a much more recent case landowners filed suit against a city under a precursor to K.S.A. 12-760: K.S.A. 12-712 (Ensley 1982). In *Hukle* v. *City of Kansas City*, 212 Kan. 627,

512 P.2d 457 (1973), the landowners alleged that the City's failure to rezone a tract of land to allow construction of a townhouse complex was unreasonable and arbitrary. The district court agreed. Fourteen days later a motion to intervene was filed by neighbors opposed to the rezoning; the motion was denied. More than 6 months later a second motion to intervene was filed; it too was denied. This court then held that the district court erred in denying the second motion to intervene. 212 Kan. at 632-33.

Although the *Hukle* court's reason for reversing the district court is not an issue in this appeal, its allowance of a motion to intervene filed more than 6 months after the cause of action accrued is of guidance. Specifically, if the district court indeed had no jurisdiction over the motion, the *Hukle* court most likely would have said so. See *State v. Denney*, 283 Kan. 781, 787, 156 P.3d 1575 (2007) (appellate court has duty to question jurisdiction on its own initiative. When record discloses a lack of jurisdiction, it is the duty of the appellate court to dismiss the appeal). In any event, the *Hukle* court certainly would not have reversed the district court to allow intervention, heard the intervenors' appeal on the merits, and then ordered judgment on their behalf; see also *Moyer v. Board of County Commissioners*, 197 Kan. 23, 415 P.2d 261 (1966) (plaintiffs sued county alleging decision to change zoning was unreasonable; 3 and ½ months later trial court agreed; county declined to appeal; adjoining landowners opposed to the zoning change requested intervention; denied by court; Supreme Court held intervention should be allowed.)

We conclude the district court had jurisdiction to determine whether to allow intervention and within its discretion chose to permit it. See *Montoy v. State*, 278 Kan. 765, Syl. ¶ 1, 102 P.3d 1158 (2005) (intervention within trial court's discretion). The Board's cross-appeal is denied.

Affirmed in part, and cross-appeal denied; several issues stayed pending receipt of supplemental briefs and oral argument.